IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2026 Session

## STATE OF TENNESSEE v. JONATHAN ANDREW BERRETTA

**Appeal from the Circuit Court for Coffee County**
**No. 2022-CR-48,197          William A. Lockhart, Judge**

_____

**No. M2024-01538-CCA-R3-CD**

_____

A Coffee County jury convicted the Defendant, Jonathan Andrew Berretta, of one count of vehicular homicide by intoxication and one count of vehicular homicide per se. The trial court merged those convictions and sentenced the Defendant to twelve years' imprisonment. On appeal, the Defendant raises thirteen issues in three broad categories: challenges to the denial of his motion to suppress the seizure of his blood, trial issues, and a sentencing issue. Challenging the denial of his motion to suppress, he contends that the trial court erred by finding that (1) the affidavit supporting the Vanderbilt University Medical Center ("VUMC") search warrant for his blood contained no false or reckless statements; (2) probable cause supported the search warrant and judicial subpoena; (3) the search warrant was not overbroad; (4) the search warrant and judicial subpoena established a sufficient nexus between VUMC and the evidence sought; (5) the VUMC blood draws were not the result of state action; and (6) an earlier warrantless EMS blood draw was supported by probable cause and exigent circumstances. Regarding his trial, the Defendant argues that the trial court erred by (7) admitting a life-in-being photograph of the victim; (8) finding that the VUMC specimen release form satisfied the business records exception to the rule against hearsay; (9) finding that chain of custody was established for the VUMC blood samples; (10) admitting the VUMC blood draw evidence in violation of the Confrontation Clause; (11) instructing the jury on vehicular homicide per se in a manner that created an unconstitutional presumption of guilt; and (12) allowing the cumulative effect of those errors to deprive him of a fair trial. Finally, the Defendant maintains that the trial court erred in (13) ordering his sentence to run consecutively to a sentence he had pending in Davidson County at the time of these offenses. Upon our review, we respectfully affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;
Judgments of the Circuit Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JOHN W. CAMPBELL, SR., JJ., joined.

Paul Andrew Justice, III, Murfreesboro, Tennessee, for the appellant, Jonathan Andrew Berretta.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Craig Northcott, District Attorney General; and Johnathan C. Hershman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

### A. THE CRASH AND INVESTIGATION

At approximately 2 a.m. on August 7, 2021, the Defendant drove in the oncoming lane of travel on Highway 55 outside of Tullahoma. In doing so, he struck Katie Leigh Bauer in a head-on collision, and she died as a result of her injuries.

The first officer on scene was Sergeant Cody Brandon with the Tullahoma Police Department ("TPD"). Based on the vehicles' positions and the layout of the divided highway, Sergeant Brandon determined that the Defendant had been traveling in the wrong lane before the collision. Sergeant Brandon further observed that Ms. Bauer's injuries were severe. He did not see the Defendant and had no direct contact with him at any point during the investigation.

Other emergency personnel arrived shortly after Sergeant Brandon, including EMS personnel and members of the Tennessee Highway Patrol ("THP"). A THP trooper notified Sergeant Brandon that he smelled alcohol on the Defendant. An emergency medical technician ("EMT") also reported that he smelled "something" on the Defendant, though Sergeant Brandon could not remember if the EMT used the word "alcohol" or other terminology.

Based on this information, Sergeant Brandon determined that probable cause existed to draw the Defendant's blood for testing. He did not believe he had sufficient time to obtain a search warrant before the Defendant was transported by helicopter to VUMC. Consequently, Sergeant Brandon directed EMS personnel to conduct a warrantless blood draw before the Defendant's transport, citing exigent circumstances.

Two days later, Sergeant Brandon applied for a search warrant to obtain samples of the Defendant's blood drawn at VUMC. Three samples—drawn at approximately 3:00, 4:28, and 7:18 a.m.—were sent to the Tennessee Bureau of Investigation ("TBI") for forensic analysis. Those samples had blood alcohol concentration ("BAC") levels of 0.283, 0.296, and 0.214, respectively.

Sergeant Brandon also obtained a search warrant for the Defendant's vehicle, including the vehicle's airbag control module. Analysis of the module revealed that the Defendant did not apply his brakes before the collision. A search of the vehicle yielded two broken liquor bottles, a broken wine bottle, and three empty beer cans.

An investigator with the district attorney's office later interviewed the Defendant. The Defendant admitted to drinking between nine and ten beers between 10 a.m. and 3 p.m. while at an IndyCar race in Nashville, followed by approximately two to four more beers after returning home. He left for Tullahoma around 7 p.m. and admitted to drinking another one to two beers during the drive. The Defendant acknowledged having a wine bottle and two liquor bottles in the car but denied drinking from them after 8:15 p.m.

Despite drinking between twelve and sixteen beers throughout the day, the Defendant did not believe he was intoxicated when he began driving. He estimated that he had fallen asleep in a parking lot on his way to Tullahoma and woke just before 2 a.m., having driven for less than a minute before the collision.

In June 2022, a Coffee County grand jury charged the Defendant with vehicular homicide by intoxication and vehicular homicide per se, among other charges.[1]

---

[1] The indictment also charged the Defendant with vehicular homicide by reckless conduct, DUI second offense, DUI second offense per se, violation of the open container law, and driving on the wrong side of the roadway. The State dismissed these charges by nolle prosequi at the start of the trial after the jury was sworn. Those charges are not part of this appeal.

## B.    THE DEFENDANT'S MOTION TO SUPPRESS

Before trial, the Defendant moved to suppress the TBI's testing of his blood samples and his VUMC medical records.  He argued that: (1) no exigent circumstances justified the warrantless blood draw; (2) the VUMC blood draws constituted state action requiring a warrant; (3) the search warrant and judicial subpoena lacked probable cause; (4) the judicial subpoena lacked a sufficient nexus between evidence of intoxication and his medical records; and (5) the search warrant was overbroad.  After holding a hearing on the motion, the trial court denied relief on all grounds.  The case then proceeded to trial in May 2024.

## C.    TRIAL, SENTENCING, AND APPEAL

The State's proof at trial largely reflected the facts described above.  The jury also heard testimony from other motorists who stopped to render aid, first responders, the TBI forensic toxicologist, and the medical examiner who performed Ms. Bauer's autopsy.  The trial court also admitted a life-in-being photograph of Ms. Bauer over the Defendant's objection.

The Defendant testified and admitted to the alcohol consumption described above.  In rebuttal, the State's TBI forensic toxicologist testified that the Defendant's account of his drinking—stopping at 8:15 p.m.—did not "make sense" given his BAC of 0.283 at 3:00 a.m.

The jury found the Defendant guilty as charged.  Following a sentencing hearing, the trial court sentenced the Defendant to twelve years' imprisonment, to be served consecutively to an existing Davidson County sentence.  The Defendant filed a timely motion for a new trial, which the trial court denied by written order filed on September 11, 2024.  The Defendant filed a timely notice of appeal twenty-six days later.  *See* Tenn. R. App. P. 4(a).

## ANALYSIS

In this appeal, the Defendant raises thirteen issues for our consideration.  Challenging the denial of his motion to suppress, he raises six grounds: four contesting the VUMC warrant and judicial subpoena, one contesting the VUMC blood draws as state action, and one challenging an earlier warrantless EMS blood draw.

- 4 -

Regarding his trial, the Defendant raises six additional issues: a challenge to a life-in-being photograph of Ms. Bauer; three evidentiary challenges to the admission of the VUMC blood samples; and a challenge to the jury instruction on vehicular homicide per se. He also contends that the cumulative effect of these alleged errors deprived him of a fair trial.

Finally, the Defendant maintains that the trial court erred in ordering his sentence to run consecutively to a sentence he had pending in Davidson County at the time of these offenses.

We address each of these issues in turn.

## A.   ISSUES RELATED TO THE DEFENDANT'S MOTION TO SUPPRESS

The Defendant raises six challenges to the trial court's denial of his motion to suppress the seizure of his blood. With respect to the blood seized from VUMC pursuant to a warrant, he argues that the trial court erred by finding that: (1) the affidavit supporting the VUMC search warrant contained no false or reckless statements; (2) probable cause supported the search warrant and judicial subpoena executed at VUMC; (3) the search warrant was not overbroad; (4) the search warrant and judicial subpoena established a sufficient nexus between VUMC and the evidence sought; and (5) the VUMC blood draws were not the result of state action. With respect to the earlier warrantless EMS blood draw, he argues that the trial court erred by (6) finding that the blood draw was supported by probable cause and exigent circumstances.

The State responds that the trial court correctly denied each ground of the motion. We agree with the State on the first five issues. On the sixth, we conclude that any alleged error in admitting evidence of the warrantless EMS blood draw was harmless beyond a reasonable doubt.

### 1.   Background

The trial court held a hearing on the Defendant's motion to suppress about two weeks before trial. The motion sought to exclude several pieces of evidence on multiple grounds. The trial court decided to hear proof on the exigent circumstances question first and rule on it before moving to the other suppression issues.

The State called Sergeant Brandon to testify about exigent circumstances. He testified that he did not believe he had enough time to get a warrant before the Defendant was transported to VUMC. He described the steps the process would have required: traveling to the TPD to draft the warrant; drafting, reviewing, and proofreading the warrant; driving to the Coffee County Jail to obtain a judicial commissioner's signature; waiting for review and copying; and then returning to the hospital where the Defendant awaited the life-flight helicopter. By Sergeant Brandon's own estimates, the entire process would have taken at least an hour and fifteen minutes.

On cross-examination, Sergeant Brandon made several key admissions. He admitted that judicial commissioners were available around the clock and could have met at the Coffee County Jail. He conceded that other officers would likely have been at the jail and that nothing stopped him from asking one of them to convey probable cause to a commissioner. The sergeant acknowledged that, despite more than twelve years of service in Coffee County, he had never sought contact information for any local judge, including on the night of the crash. He also confirmed that he never considered asking Davidson County law enforcement for help once the Defendant arrived at VUMC. Separately, Trooper Boles told Sergeant Brandon that the Defendant said he was returning from an IndyCar race in Nashville.

The trial court ruled on the exigent circumstances issue first. It began by crediting Sergeant Brandon's testimony about the warrant acquisition timeline, finding that the process would have taken at least an hour, more time than was available before the Defendant's departure. The court found that Sergeant Brandon arrived on scene at 2:08 a.m. and directed medical and emergency personnel to respond. After speaking with Trooper Boles and an EMT, Sergeant Brandon determined at approximately 2:38 a.m. that he had probable cause to draw the Defendant's blood. The court found that obtaining and executing a warrant before the Defendant's scheduled departure was not feasible and ruled that exigent circumstances justified the warrantless blood draw.

The court also made a separate probable cause finding for the warrantless draw. It identified three supporting factors: the Defendant's driving in the wrong lane of travel in the middle of the night, the odor of alcohol, and the Defendant's statement to Trooper Boles about returning from an IndyCar race in Nashville, which the court found inconsistent with his direction of travel.

The court then turned to the remaining grounds of the Defendant's motion. Sergeant Brandon had also applied for and executed the search warrant for the Defendant's blood

samples at VUMC. His affidavit identified his law enforcement training and experience, including specialized DUI training. It described the time and place of the crash, the people involved, and the Defendant's driving in the wrong lane that caused Ms. Bauer's death. It also stated that Paramedic Jimmy Adams and Advanced EMT Shelby Stewart told law enforcement that a strong odor of alcohol came from the Defendant's person and filled the rear of the ambulance.

At the hearing on the remaining issues, the Defendant called Sergeant Brandon to testify about the affidavit and the investigation underlying it. Sergeant Brandon remembered calling both Paramedic Adams and EMT Stewart the day after the crash. They told him the smell of alcohol had filled the rear of the ambulance. He could not recall their exact words but said his affidavit accurately reflected what they communicated. When asked how he knew VUMC would draw the Defendant's blood, Sergeant Brandon said he considered it standard hospital practice. He also confirmed that he did not contact anyone at VUMC between the crash and when he applied for the warrant.

Paramedic Adams and EMT Stewart also testified. Paramedic Adams did not recall telling Sergeant Brandon about the case. He confirmed, however, that the whole rear of the ambulance smelled of alcohol. He rated the smell a ten out of ten and described it as being "very strong" and "very noticeable." EMT Stewart testified that the Defendant told them he had taken some pills and had been drinking. EMT Stewart could not describe the smell in the rest of the ambulance because he was positioned directly in front of the Defendant. He described the odor as "very intense" and "just like hot alcohol."

After hearing all the evidence and the parties' arguments, the trial court denied each remaining ground of the Defendant's motion from the bench.

### 2. Standard of Appellate Review

For every issue raised on appeal, we must first determine the appropriate standard of review. *State v. Enix*, 653 S.W.3d 692, 698 (Tenn. 2022). In reviewing a trial court's ruling on a motion to suppress, "we will uphold the trial court's findings of fact unless the evidence preponderates against those findings." *State v. Stanfield*, 554 S.W.3d 1, 8 (Tenn. 2018). The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing[,] as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). In reviewing a trial court's ruling on a pretrial motion to suppress, we

may consider the evidence introduced at both the suppression hearing and trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). We review the trial court's application of the law to the facts de novo with no presumption of correctness. *State v. Henry*, 539 S.W.3d 223, 232 (Tenn. Crim. App. 2017).

### 3. Hospital Search Warrant and Judicial Subpoena

The Defendant argues that the affidavit's allegation—that Paramedic Adams and EMT Stewart reported a strong smell of alcohol that filled the rear of the ambulance—must be removed from the probable cause analysis. He contends that Sergeant Brandon's bodycam footage and testimony show the statement was either a reckless or intentional falsehood. He further argues that, once the allegation is removed, the affidavit's remaining facts fail to establish probable cause for the VUMC blood draw. The State responds that the statement accurately reflected what Sergeant Brandon was told and that there is no basis to impeach it. We agree with the State.

### a. The Warrant Requirement

The Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution both protect citizens from unreasonable searches and seizures. In the context of a search warrant, that protection requires a neutral and detached magistrate to issue the warrant "upon probable cause." *State v. Davidson*, 509 S.W.3d 156, 182 (Tenn. 2016). Tennessee Code Annotated section 40-6-103 requires the supporting affidavit to name or describe the person and particularly describe the property and place to be searched. Searches conducted pursuant to valid warrants are presumptively reasonable. *State v. Hamm*, 589 S.W.3d 765, 771 (Tenn. 2019) (citing *State v. McCormick*, 494 S.W.3d 673, 678-79 (Tenn. 2016)).

Probable cause exists when the facts set out in the affidavit are sufficient "to warrant a person of reasonable caution in believing" that evidence of a crime will be found in the place to be searched—a standard requiring more than mere suspicion but considerably less than proof beyond a reasonable doubt. *State v. Bell*, 429 S.W.3d 524, 534 (Tenn. 2014). That determination is practical rather than technical, turning on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *State v. Tuttle*, 515 S.W.3d 282, 306-07 (Tenn. 2017) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). A court examining probable cause must consider the totality of the circumstances set forth in the affidavit. *Tuttle*, 515 S.W.3d at

307-08.  The affidavit must establish "a nexus between the criminal activity, the place to be searched, and the items to be seized" and must contain more than conclusory allegations. *Id.* at 300; *Henning*, 975 S.W.2d at 294.

Affidavit language is to be read in a "commonsense, nonhypertechnical fashion." *State v. Moon*, 841 S.W.2d 336, 339 (Tenn. Crim. App. 1992).  Our supreme court has confirmed that the probable cause determination must reflect "the nontechnical, commonsense approach" applied to "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Tuttle*, 515 S.W.3d at 306-07 (quoting *Brinegar*, 338 U.S. at 175).

The reliability of hearsay information in an affidavit depends on its source.  *Tuttle*, 515 S.W.3d at 302 (citing *State v. Williams*, 193 S.W.3d 502, 507 (Tenn. 2006)).  Where the source is a law enforcement officer, no special showing of reliability is required.  *Id.*  A presumption of reliability also applies to citizen informants, as long as the affidavit identifies them by name.  *Id.*  Where the source is an unknown informant or one from the criminal milieu, the affidavit must establish both the informant's basis of knowledge and veracity.  *Id.* at 302-03.

When the question is whether a search warrant was supported by probable cause, a separate and more deferential standard governs our review of the magistrate's findings.  Our review is limited to "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause."  *State v. Meeks*, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993); *see also State v. McLawhorn*, 636 S.W.3d 210, 239 (Tenn. Crim. App. 2020).  Stated differently, the question is whether the affidavit gave the magistrate "a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing."  *Tuttle*, 515 S.W.3d at 299 (citation and internal quotation marks omitted).  Indeed, our review is limited to the four corners of the affidavit.  *Henning*, 975 S.W.2d at 295.  We will not consider additional evidence known by the magistrate or possessed by the affiant but omitted from the affidavit.  *Tuttle*, 515 S.W.3d at 299.

### b.    Alleged False Statement and Omission in the Affidavit

The Defendant argues that the affidavit's allegation—that Paramedic Adams and EMT Stewart reported a strong smell of alcohol that filled the rear of the ambulance—must be removed from the probable cause analysis.  He contends that Sergeant Brandon's bodycam footage and testimony show the statement was either a reckless or intentional

falsehood, and that the allegation should therefore not be considered. The State responds that the statement accurately reflected what Sergeant Brandon was told and that there is no basis to impeach it. We agree with the State.

Because a magistrate must rely on accurate information when making a probable cause determination, false or misleading statements in an affidavit may invalidate a search warrant. *State v. Norris*, 47 S.W.3d 457, 469 n.4 (Tenn. Crim. App. 2000); *State v. Little*, 560 S.W.2d 403, 407 (Tenn. 1978). As our supreme court has explained,

> [T]here are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that [the] affiant did not have reasonable grounds for believing it, at that time.

*Little*, 560 S.W.2d at 407; *see also State v. Willis*, 496 S.W.3d 653, 721 (Tenn. 2016); *State v. Dellinger*, 79 S.W.3d 458, 470 (Tenn. 2002) (same).

The two circumstances differ in a critical respect. Where an officer intended to deceive the magistrate, any false statement—whether material to probable cause or not—will impeach the affidavit. *Little*, 560 S.W.2d at 407. Where an officer did not intend to deceive, a false statement impeaches the affidavit only if it was both recklessly made and essential to the establishment of probable cause. *Id.*; *Dellinger*, 79 S.W.3d at 470; *Willis*, 496 S.W.3d at 721. Allegations of mere negligence or innocent mistake are insufficient. *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

The "essential to probable cause" requirement imposes an additional limit even where recklessness is found. "In order to be 'essential to the establishment of probable cause,' the false or reckless statement must be the only basis for probable cause or if not, the other bases, standing alone, must not be sufficient to establish probable cause." *Willis*, 496 S.W.3d at 721 (quoting *Norris*, 47 S.W.3d at 469 n.4).

The *Little* framework also extends to omissions. But "an affidavit omitting potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *Willis*, 496

S.W.3d at 721 (quoting *State v. Yeomans*, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999)); *see also State v. Hardison*, 680 S.W.3d 282, 310 (Tenn. Crim. App. 2023). The defendant bears the burden of proving any allegation of falsity or reckless omission by a preponderance of the evidence. *Tuttle*, 515 S.W.3d at 308.

### i.      Was the Statement False?

As to the first *Little* category, we must ask whether the statement was false and, if so, whether it was intentionally so. The Defendant points to three items in support of his argument that the statement was false: Sergeant Brandon's bodycam statement that he smelled nothing; the inability of Paramedic Adams and EMT Stewart to recall a phone conversation three years after the crash; and testimony from other officers at the scene who detected only a faint odor or none at all. None of these items, individually or together, establishes that the affidavit's allegation was false.

The record refutes the Defendant's reading of both the affidavit and the suppression hearing proof. The relevant portion of the affidavit states:

> Upon response and on scene treatment by Coffee County EMS Paramedic Jimmy Adams and Advanced EMT Shelby [Stewart], information was shared with law enforcement officers that a strong odor generally associated with alcoholic beverages was emanating from Jonathan Andrew Berretta's person. The odor was described as having permeated the rear of the ambulance.

The Defendant reads this language as having only one possible meaning: that Paramedic Adams and EMT Stewart communicated the smell to Sergeant Brandon at the crash scene on the night of the crash. That reading is inconsistent with the commonsense, nonhypertechnical approach our supreme court has directed courts to apply. *See Tuttle*, 515 S.W.3d at 306-07; *State v. Whaley*, No. E2024-00387-CCA-R3-CD, 2025 WL 3541414, at *21 (Tenn. Crim. App. Dec. 10, 2025) (rejecting hypertechnical parsing of affidavit language and applying a commonsense reading), *perm. app. denied* (Tenn. May 21, 2026).

The record shows that Paramedic Adams and EMT Stewart responded and treated the Defendant on scene. Sergeant Brandon testified that he spoke to both of them by phone the day after the crash. Paramedic Adams confirmed that the whole rear of the ambulance smelled of alcohol, rating the smell a ten out of ten. EMT Stewart could not speak to the

- 11 -

smell in the rear of the ambulance because he was working directly in the Defendant's face, and he described that odor as very intense, "just like hot alcohol."

The fact that Sergeant Brandon smelled nothing does not contradict the affidavit—he had no personal contact with the Defendant. The same is true of the other EMT and the THP trooper, neither of whom was in the rear of the ambulance with Paramedic Adams and EMT Stewart. The inability of Paramedic Adams and EMT Stewart to recall a phone conversation from three years earlier does not undermine Sergeant Brandon's unimpeached testimony that he contacted them the day after the crash. Read in a commonsense manner, the affidavit's allegation is consistent with the proof at the suppression hearing and at trial and does not amount to a false statement, whether reckless or intentional.

### ii. Even If the Statement Were False, Was It Intentionally False?

Next, in determining the first *Little* category, we must then ask if the statement was intentionally false. Assuming that the statement was in fact false—and we do not so conclude—nothing in the record supports a finding that Sergeant Brandon intended to deceive the magistrate. He testified without contradiction that he called Paramedic Adams and EMT Stewart the day after the crash and that his affidavit accurately reflected what they communicated to him. The Defendant offered no evidence of deliberate falsity—no contrary testimony, no objective evidence, no offer of proof—and *Franks* requires more than conclusory allegations to mandate even an evidentiary hearing on this question. *Franks*, 438 U.S. at 171; *see also Willis*, 496 S.W.3d at 721. The first *Little* category, therefore, does not apply.

### iii. Even If Recklessly Made, Was the Statement Essential to Probable Cause?

In applying the second *Little* category, the Defendant's challenge also fails at this step. Even if the odor allegation were set aside entirely, the affidavit independently establishes probable cause through two other categories of facts: the Defendant's fatal head-on collision caused by driving eastbound in the westbound lane of travel, and Sergeant Brandon's explicit opinion—formed without any reliance on the odor—that "in all probability the motor vehicle accident involving a fatality was a result of [the Defendant's] intoxication," grounded in fifteen years of law enforcement experience and specialized DUI training.

As we explain in our discussion of probable cause in the next section below, those other facts alone gave the magistrate a substantial basis for finding probable cause. *See State v. Kroese*, No. M2022-01180-CCA-R3-CD, 2024 WL 2034366, at *13-15 (Tenn. Crim. App. May 7, 2024), *perm. app. denied* (Tenn. Jan. 22, 2025); *State v. Ryder*, No. M2024-01717-CCA-R9-CO, 2025 WL 2536352, at *9 (Tenn. Crim. App. Sept. 4, 2025), *perm. app. denied* (Tenn. Feb. 25, 2026). Because probable cause exists independent of the odor allegation, that allegation cannot be "essential to the establishment of probable cause." *Willis*, 496 S.W.3d at 721. As such, the Defendant's challenge on this ground lacks merit as well.

### iv.     The Defendant's Omissions Argument

The Defendant also argues that Sergeant Brandon recklessly omitted material information from the affidavit—specifically, that Sergeant Brandon himself detected no odor of alcohol and that other officers at the scene similarly detected no strong odor. He contends that had these omissions been included, the affidavit would not have established probable cause. The State responds that the information in the affidavit was true regardless of who relayed it to Sergeant Brandon or when. We agree with the State.

An omission-based challenge faces a higher threshold than an affirmative-false-statement challenge, because "an affidavit omitting potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *Yeomans*, 10 S.W.3d at 297; *Hardison*, 680 S.W.3d at 310. Nothing in the record suggests that Sergeant Brandon intentionally withheld what he considered material information. His failure to note that he personally detected no odor was, at most, a drafting omission—not a deliberate or reckless withholding of material facts. *See Ryder*, 2025 WL 2536352, at *8-9 (holding that an officer's failure to identify the precise source of a statement in the affidavit was "at most negligent drafting and not a false and reckless statement").

Moreover, even if Sergeant Brandon had included his personal observation, it would not have negated probable cause, as we discuss in the next section. Because he had no personal contact with the Defendant, his inability to detect an odor was entirely consistent with the affidavit's allegation that the emergency personnel working directly on the Defendant inside the ambulance reported a strong smell. That disclosure would not have eliminated the showing of probable cause. *See Yeomans*, 10 S.W.3d at 297.

- 13 -

There is an additional and independent reason to reject both the false-statement and omissions arguments. The affidavit identifies Paramedic Adams and EMT Stewart by name and professional role. A presumption of reliability attaches to named citizen informants. *Tuttle*, 515 S.W.3d at 302. That presumption applies here. The Defendant bears the general burden of proving falsity by a preponderance of the evidence. *Id.* at 308. He must also overcome the presumption of reliability that the law extends to named citizen informants. Nothing in the record carries either burden.

We conclude that the Defendant has not carried his burden under *Little*. As such, he is not entitled to relief on this ground.

### c.     Probable Cause Supporting the VUMC Warrant

The Defendant next argues that even with Sergeant Brandon's allegations left intact, the affidavit does not establish probable cause. He contends that the only relevant facts—a crash and an odor of alcohol—fall short of the standard, particularly because no field sobriety tests were given, no physical signs of impairment were observed, and the Defendant made no admission to drinking. The State responds that the combination of the crash, the odor, and Sergeant Brandon's training-based opinion satisfies the standard. We agree with the State.

### i.     Probable Cause in Impaired Driving Cases

As we noted above, probable cause to support a warrant exists when the facts set out in the affidavit are sufficient "to warrant a person of reasonable caution in believing" that evidence of a crime will be found in the place to be searched. *Bell*, 429 S.W.3d at 534. In impaired driving cases, probable cause is assessed on the totality of the circumstances. *Tuttle*, 515 S.W.3d at 307-08. No single factor is required, and a defendant need not exhibit every known sign of intoxication. *Bell*, 429 S.W.3d at 535.

The absence of field sobriety tests, physical signs of impairment, or an admission to drinking does not defeat probable cause where other indicators are present. *Whaley*, 2025 WL 3541414, at *20 (holding that the omission of field sobriety test results, the defendant's demeanor, and other typical DUI indicators from the affidavit "was not necessary to establish probable cause"). Our courts have identified three categories of facts that are particularly relevant to assessing probable cause in impaired driving cases:

- **Driving behavior and crash characteristics.** The nature of a driver's conduct and the character of a resulting crash are among the most probative indicators available to an investigating officer. *See Kroese*, 2024 WL 2034366, at *14 ("We can appropriately recognize certain driving behaviors as sound indicia of drunk driving." (quoting *Navarette v. California*, 572 U.S. 393, 402 (2014))). Indeed, driving in the opposing lane of traffic on a divided highway is conduct inconsistent with unimpaired driving, particularly when it results in a fatal head-on collision. *See Whaley*, 2025 WL 3541414, at *20 (concluding that driving in the wrong lane on a highway resulting in a fatal head-on collision, combined with an odor of an intoxicant, established probable cause for a blood draw warrant); *Kroese*, 2024 WL 2034366, at *13-15 (holding that "elements of the fatal crash were inconsistent with unimpaired driving and therefore supported probable cause for a search warrant for a blood draw"); *Bell*, 429 S.W.3d at 535 (concluding that driving on the wrong side of a divided highway, combined with an odor of alcohol, "clearly support[ed] a finding of probable cause for DUI"); *see also State v. Crisp*, No. M2013-01339-CCA-R3-CD, 2014 WL 3540646, at *7 (Tenn. Crim. App. July 17, 2014) (finding probable cause where the totality of the circumstances included a head-on collision in the opposing lane, an odor of alcohol, and an admission to drinking), *no perm. app. filed.*

- **Evidence of Alcohol Use.** Evidence of alcohol use, including a driver's admission of use or an odor of alcohol detected on or near a suspect, is a recognized factor in the probable cause analysis. *See State v. Evetts*, 670 S.W.2d 640, 642 (Tenn. Crim. App. 1984) (holding that odor of alcohol at a crash scene, combined with the crash itself, supported probable cause even without visible signs of intoxication). The strength and source of the odor are also relevant. Thus, a report of a strong odor from a named, identified person in close physical contact with the suspect carries more weight than a fleeting or uncertain observation from a distance. *See Evetts*, 670 S.W.2d at 642; *Roscoe*, 2014 WL 3511041, at *4. Of course, an odor of alcohol alone is not sufficient for probable cause. *State v. Sides*, No. E2000-01422-CCA-R3-CD, 2001 WL 523375, at *3 (Tenn. Crim. App. May 16, 2001) (holding insufficient an officer's statement that he "thought" he detected "not a strong odor, but an odor of alcohol"), *no perm. app. filed*.

- **The Officer's training and experience.** An officer's specialized training in DUI detection and accident investigation is a recognized factor when the

officer applies that training to the facts and forms an explicit opinion. *See Ryder*, 2025 WL 2536352, at *9 (holding that an affidavit's recitation of the officer's specialized DUI training and his training-based opinion of intoxication was a relevant factor in the totality analysis). All information in the officer's possession, including inferences drawn from past experience, is relevant to the probable cause determination. An officer's opinion alone will not establish probable cause, but it gives weight to the other facts in the affidavit. *Evetts*, 670 S.W.2d at 642.

## ii. Application

Measured against these standards, Sergeant Brandon's affidavit gave the magistrate a substantial basis for finding probable cause.

On driving behavior and crash characteristics, the affidavit stated that the Defendant caused a fatal head-on collision by driving eastbound in the westbound lane of travel on New Manchester Highway in the early morning hours of August 7, 2021. Driving in the opposing lane of a divided highway and striking an oncoming vehicle head-on in the predawn hours is conduct that a person of reasonable caution would recognize as inconsistent with unimpaired driving. *See Kroese*, 2024 WL 2034366, at *13-15; *Bell*, 429 S.W.3d at 535; *Whaley*, 2025 WL 3541414, at *20.

On the odor of alcohol, the affidavit stated that Paramedic Adams and EMT Stewart—each identified by name and their professional role—reported a strong odor of alcohol emanating from the Defendant's person that filled the rear of the ambulance. This is not the tentative, uncertain observation that has fallen short in other cases. *See Sides*, 2001 WL 523375, at *3. Paramedic Adams and EMT Stewart were in the rear of the ambulance in sustained, direct contact with the Defendant. Their report was specific, consistent, and grounded in close personal observation. As named citizen informants, their reports carry the presumption of reliability recognized under *Tuttle*. *See Tuttle*, 515 S.W.3d at 302. Together, the report of alcohol odor and the crash characteristics described above constitute the kind of pairing that *Roscoe* and *Bell* recognized as clearly supporting probable cause. *See Roscoe*, 2014 WL 3511041, at *4; *Bell*, 429 S.W.3d at 535.

On officer training and opinion, the affidavit described Sergeant Brandon's fifteen years of law enforcement experience, his education in motor vehicle accident investigation and DUI enforcement, and his specialized DUI training at the Tennessee Law Enforcement

Training Academy. Drawing on that training and those facts, he stated explicitly, "In all probability, the motor vehicle accident involving a fatality was a result of [the Defendant's] intoxication." That opinion, formed by an experienced officer after personally investigating the crash, is an independent factor in the magistrate's assessment. *Evetts*, 670 S.W.2d at 642; *Ryder*, 2025 WL 2536352, at *9.

The Defendant argues that this affidavit falls short because it contains no admission that he had been drinking or consumed alcohol. He relies on *Bell*, 429 S.W.3d at 535, which found probable cause where the defendant had admitted drinking "more than he should have." But *Bell* did not hold that an admission is required. It held that probable cause existed when an admission was present, along with driving in the wrong lane of travel and an odor of alcohol. *See Bell*, 429 S.W.3d at 535.

Importantly, probable cause is not undermined by the lack of an admission when the crash characteristics are inconsistent with unimpaired driving, medical professionals who personally evaluated the Defendant report a strong odor of alcohol, and a trained officer expressly concludes that the Defendant was intoxicated. *See Evetts*, 670 S.W.2d at 642 (finding probable cause without any admission); *Roscoe*, 2014 WL 3511041, at *4-5 (same); *Whaley*, 2025 WL 3541414, at *20 (holding that an affidavit is not deficient because it omits information an officer chose not to include, as long as what is included provides a substantial basis for finding probable cause). Respectfully, this argument is without merit.

These three categories of facts—a fatal crash caused by driving in the opposing lane in the predawn hours, a strong odor of alcohol reported by medical professionals in direct contact with the Defendant, and an experienced officer's opinion of intoxication grounded in fifteen years of experience and specialized DUI training—together gave the magistrate a substantial basis for concluding that evidence of intoxication would be found in the Defendant's blood at VUMC. *See Kroese*, 2024 WL 2034366, at *13-15; *Ryder*, 2025 WL 2536352, at *9; *Whaley*, 2025 WL 3541414, at *20. The Defendant is not entitled to relief on this ground.

### d.    Overbreadth Challenge to the Warrant

The Defendant next argues that the search warrant for the VUMC samples was overbroad. He asserts that the warrant authorized law enforcement to seize "all" of his bodily fluid samples without identifying which samples were needed or why. The State

responds that the warrant was sufficiently limited and did not permit the kind of general search prohibited by the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution. We agree with the State.

Both the Fourth Amendment and Article I, section 7 require a warrant to describe with particularity the property to be seized. Tennessee Code Annotated section 40-6-103 likewise requires that the supporting affidavit particularly describe the property and place to be searched. To satisfy the particularity requirement, a warrant "must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *State v. Meeks*, 867 S.W.2d 361, 367 (Tenn. Crim. App. 1993) (quoting *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981)).

The particularity requirement limits the executing officer's discretion and prevents general searches. *See Henning*, 975 S.W.2d at 296. It also ensures that the warrant's scope remains tied to the probable cause shown and leaves nothing about the scope of the search to the officer's discretion. *See McLawhorn*, 636 S.W.3d at 239-40. Stated differently, the requirement "makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another." *Hardison*, 680 S.W.3d at 312. Thus, "[w]here the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other." *Lea v. State*, 181 S.W.2d 351, 352-53 (Tenn. 1944).

The particularity inquiry is also context-specific. A warrant need not describe property with a level of precision that is impossible before the search occurs. In *Lea*, our supreme court recognized that when officers search for property of a specified character, the warrant may describe the property by its character, place, and surrounding circumstances. *Id.* That principle applies with particular force to biological evidence. In *State v. Williams*, No. M2019-01480-CCA-R3-CD, 2021 WL 1053909, at *19 (Tenn. Crim. App. Mar. 19, 2021), *perm. app. denied* (Tenn. June 9, 2021), this court rejected a particularity challenge to a warrant authorizing seizure of biological evidence, including human hair, tissue, bone fragments, teeth, blood, and latent fingerprints. The court reasoned that officers could not know the source of the biological evidence before testing, and the absence of that additional precision did not make the warrant a general warrant. *Id.*

Measured by these principles, the warrant in this case was sufficiently particular as applied to the VUMC blood samples admitted at trial. The warrant authorized the seizure of a blood sample taken from the Defendant "on or about 08.07.2021" or when he was

admitted to VUMC or the VUMC emergency room. It also authorized seizure of other samples, including blood, urine, or other samples taken for patient medical testing. The trial court concluded that law enforcement was not required to obtain a separate warrant for each individual sample and that the warrant was limited to samples related to the Defendant's treatment immediately after the crash.

The warrant further contained meaningful limits on the executing officer's discretion. It identified the person whose samples could be seized. It identified the place to be searched as VUMC and its laboratory services. It tied the evidence to the Defendant's admission and treatment after the crash on August 7, 2021. It also described the class of evidence sought as biological samples taken for medical testing. These limitations allowed the executing officer to reasonably identify the items authorized for seizure. They also prevented the officer from searching unrelated medical property or records without constraint.

In addition, even if the phrase "all other samples" could be read more broadly than the affidavit's probable cause allowed, that reading would not require suppression of the VUMC blood samples admitted at trial. A warrant that sufficiently describes some items but not others may be partially valid when the valid portion can be severed. *Meeks*, 867 S.W.2d at 372-73. Once the valid portion is severed, the reasonableness of the search is measured by that valid portion. *Id.*; *see also Hardison*, 680 S.W.3d at 313-14. The VUMC blood samples admitted at trial were drawn within hours of the crash and fell within the portion of the warrant supported by probable cause and described with sufficient particularity. Even under a severance analysis, the Defendant has not shown that the admitted blood-test evidence was obtained through an unconstitutional general search.

The warrant's limitations also distinguish this case from *Meeks*. In *Meeks*, portions of the warrant authorized the seizure of ordinary household items—including jewelry, firearms, and clothing—without describing how those items could be distinguished from similar property lawfully possessed in the home. *Meeks*, 867 S.W.2d at 371-72. That warrant left the executing officer without adequate guidance in determining which items were connected to the crime. *Id.* The warrant here presented no comparable problem. It did not authorize officers to select among categories of ordinary property based on their own judgment of relevance. It identified biological samples belonging to a particular person, held at a particular medical facility, drawn during a particular course of emergency treatment following a specific crash. Those limitations provide the guidance missing in *Meeks* and are sufficient to satisfy the particularity requirement. The Defendant is not entitled to relief on this issue.

### e.    Nexus Supporting the VUMC Warrant and Subpoena

Turning to a distinct challenge to the same warrant and subpoena, the Defendant argues that the affidavit failed to establish a sufficient nexus between VUMC and the evidence sought.  More specifically, he asserts that the affidavit did not give the issuing judge a factual basis to conclude that VUMC actually possessed blood samples or medical records containing evidence of his intoxication.  According to the Defendant, Sergeant Brandon merely assumed, based on his personal and professional experience, that such evidence would be found at VUMC.

The State responds that the affidavit did not rest solely on speculation.  The State argues that Sergeant Brandon's experience, the Defendant's emergency transport to VUMC, the nature of his traumatic injuries, and the preservation request together provided a sufficient basis to infer that VUMC possessed the evidence sought.  We agree with the State.

As discussed above, a search warrant affidavit must provide the issuing magistrate with a basis to conclude that evidence of a crime will be found at the place to be searched.  Facts that "connect a crime or criminal activity to the premises to be searched are critical and must be included in an affidavit for a search warrant."  *State v. Hayes*, 337 S.W.3d 235, 256 (Tenn. Crim. App. 2010).  The affidavit must establish a nexus between the place to be searched and the items to be seized.  *See, e.g.*, *Tuttle*, 515 S.W.3d at 300-01; *State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009).  That nexus may be shown through "the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence."  *Tuttle*, 515 S.W.3d at 301; *see also State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002).

The affidavit established the required nexus between the vehicular homicide investigation, VUMC, and the Defendant's blood samples and medical records.  Sergeant Brandon stated that the Defendant was involved in a fatal crash, sustained serious injuries, and was transported by helicopter to VUMC for emergency medical treatment.  He further stated that hospital staff drew the Defendant's blood as part of that treatment, that VUMC's laboratory analyzed the sample, and that the remaining untested sample would be held at the laboratory for possible further analysis.  The application also included a preservation letter from the District Attorney's office requesting that VUMC preserve any blood drawn from the Defendant until a search warrant could be served.  Although the preservation letter

did not independently confirm that blood had been drawn, it supported the commonsense inference that any existing sample would remain at VUMC.

These facts provided more than Sergeant Brandon's bare assertion or speculation. The affidavit identified the nature of the offense under investigation: vehicular homicide by intoxication. It identified the nature of the evidence sought: blood samples and medical records bearing on the Defendant's blood-alcohol content and treatment after the crash. It also identified why that evidence would likely be found at VUMC: the Defendant had been transported to VUMC for emergency trauma care, his blood had been drawn and analyzed at the hospital, and VUMC had been asked to preserve any remaining sample. A magistrate could reasonably infer from these facts that evidence of the Defendant's intoxication would be located at VUMC.

The Defendant's argument isolates Sergeant Brandon's reference to his experience from the rest of the affidavit. The nexus finding did not depend on that experience alone. Sergeant Brandon's experience supplied context for the medical and investigative facts set out in the affidavit. Those facts, read together and in a practical manner, established a fair probability that VUMC possessed blood samples and medical records relevant to the investigation. Accordingly, the warrant was not deficient for lack of nexus.

For the same reasons, the Defendant has not shown that the judicial subpoena failed to identify a sufficient connection between VUMC and the requested records. The Defendant is not entitled to relief on this issue.

### 4.    State Action Requirement:  VUMC Blood Draws

Independent of his challenges to the VUMC warrant and subpoena, the Defendant next argues that the blood draws performed at VUMC constituted warrantless governmental searches. Specifically, he asserts that the draws were performed at the direction of law enforcement—or at least as part of continuing cooperation between law enforcement, emergency responders, the life-flight crew, and VUMC personnel—and thus constituted state action. He also contends that there was no reason to draw and test his blood for alcohol other than to support a later criminal prosecution.

The State responds that the record contains no proof that VUMC personnel acted at the direction of law enforcement and that the blood draws were performed for medical treatment. We agree with the State.

### a. Background

The Defendant was transported from Harton Regional Medical Center in Tullahoma to VUMC by a life-flight helicopter. Before he was loaded into the helicopter, paramedics drew his blood at the direction of law enforcement. A nurse assisting the paramedics remarked that law enforcement might need to subpoena the Defendant's medical records from VUMC because of difficulty drawing blood at the scene. None of the first responders traveled with the Defendant to VUMC.

As part of the Defendant's medical care, ambulance personnel provided the life-flight crew with a medical report noting the possibility that the Defendant had consumed alcohol. At VUMC, medical personnel drew the Defendant's blood on multiple occasions and tested it for several purposes, including ethyl alcohol.

The trial court found that the VUMC blood draws did not constitute state action. The court emphasized that no VUMC personnel testified that the draws were performed at law enforcement's direction and that the record contained no proof that VUMC acted for an investigative purpose. Although the court recognized that officers may have anticipated that VUMC would draw the Defendant's blood, it found that the VUMC testing was performed for medical treatment, not to prosecute the Defendant for DUI-related offenses.

### b. Governing Law

The Fourth Amendment and Article I, section 7 of the Tennessee Constitution restrain governmental conduct, not purely private action. Thus, "evidence gathered by private persons is generally not subject to the exclusionary rule because with private action there is no police misconduct to be deterred." *State v. Sanders*, 452 S.W.3d 300, 311 (Tenn. 2014). A private person's conduct may implicate constitutional search-and-seizure protections, however, when the person acts as an agent or instrument of the government. *State v. Burroughs*, 926 S.W.2d 243, 245-46 (Tenn. 1996).

In *Burroughs*, our supreme court adopted the "legitimate independent motivation" test to determine when a private person's search should be attributed to the State. *Id.* at 245-46. Under that test, the critical factors are "(1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search." *Id.* at 246. Our supreme court later confirmed that both factors must be established before a private person's action may be attributed to the government. *Sanders*, 452 S.W.3d at 308.

Accordingly, cooperation with law enforcement does not necessarily create agency. *Burroughs*, 926 S.W.2d at 246. Nor does government knowledge alone suffice if the private party acted for a legitimate reason independent of the government's investigative purpose. *Id.*; *Sanders*, 452 S.W.3d at 308.

This court has applied these principles in the context of blood drawn by medical personnel after motor-vehicle crashes. When hospital personnel draw and test blood for purposes of medical treatment, and not at the request or direction of law enforcement, the blood draw does not constitute state action for Fourth Amendment purposes. *See State v. Ridge*, 667 S.W.2d 502, 505 (Tenn. Crim. App. 1982); *State v. McCoy*, No. 9, 1991 WL 35749, at *2 (Tenn. Crim. App. Mar. 20, 1991), *perm. app. denied* (Tenn. July 1, 1991); *State v. Asbury*, No. E2008-01641-CCA-R3-CD, 2010 WL 1741365, at *10 (Tenn. Crim. App. Apr. 30, 2010), *perm. app. denied* (Tenn. Sept. 21, 2010); *State v. Moore*, No. M2020-01147-CCA-R3-CD, 2022 WL 1086677, at *7 (Tenn. Crim. App. Apr. 12, 2022), *no perm. app. filed*.

### c.     Analysis

The record supports the trial court's conclusion that the VUMC blood draws were private medical actions, not governmental searches. The Defendant's argument depends on treating the emergency responders, the life-flight crew, and VUMC personnel as a single continuous state actor. The record does not support that premise.

Although paramedics drew blood at law enforcement's direction before the Defendant was transported, that earlier law-enforcement-directed draw did not establish that VUMC later acted as an agent of law enforcement. No officer or first responder accompanied the Defendant to VUMC. No evidence showed that law enforcement communicated with VUMC personnel before the hospital blood draws occurred. And no proof showed that any officer requested, directed, encouraged, or acquiesced in VUMC's decision to draw or test the Defendant's blood.

The Defendant points to the EMS report, noting possible alcohol consumption, but that medical communication does not establish state action. The report was transmitted as part of the Defendant's emergency medical care. It provided medical information to those responsible for his treatment. It did not direct VUMC to obtain evidence for law enforcement, and nothing in the record shows that VUMC personnel understood it as a

- 23 -

direction. Thus, the first *Burroughs* factor—government knowledge and acquiescence in the challenged hospital blood draws—is not established.

The second factor also weighs against a finding of state action. VUMC had a legitimate independent medical reason to draw and test the Defendant's blood. The Defendant had sustained serious traumatic injuries and was transported by life flight for emergency treatment. Testing for a range of conditions—rather than ethyl alcohol alone—is consistent with the medical evaluation and treatment of a critically injured trauma patient. Thus, the presence of an ethyl-alcohol result within that broader medical testing does not transform the hospital's conduct into state action. As this court has recognized, blood drawn and analyzed by hospital personnel in connection with medical treatment is not a governmental search merely because the results are later obtained and used by the State. *See McCoy*, 1991 WL 35749, at *2; *Asbury*, 2010 WL 1741365, at *10; *Moore*, 2022 WL 1086677, at *7.

The Defendant also argues that because law enforcement expected VUMC to draw blood, the VUMC draws must have been performed for prosecution. That argument conflates law enforcement's expectation with VUMC's purpose. Even if officers anticipated that medical personnel would draw blood during emergency treatment, the relevant question is whether VUMC acted with a legitimate independent motivation or instead acted to assist the government's investigative purpose. The trial court found that the VUMC testing was performed for the Defendant's medical care, stating that it was done for the Defendant's benefit "to save his life and make sure he could survive the accident." The evidence in the record does not preponderate against that finding.

This case is materially different from one in which medical personnel draw blood at the written request or direction of law enforcement. Here, the challenged VUMC blood draws were performed by hospital personnel during emergency medical treatment, without proof of law enforcement direction, request, or participation. Because the Defendant failed to establish that VUMC acted as an agent or instrument of the State, the VUMC blood draws did not implicate the Fourth Amendment or Article I, section 7. The Defendant is not entitled to relief on this issue.

### 5. Warrantless EMS Blood Draw

Separate from the blood draws conducted at VUMC, the Defendant also challenges the earlier EMS blood draw occurring before his transport to VUMC. He argues that the

EMS blood sample should have been suppressed because Sergeant Brandon lacked probable cause to believe his blood contained evidence of intoxication and because, in any event, no exigent circumstances made obtaining a warrant impractical.

The State responds that Sergeant Brandon had probable cause and that the circumstances justified immediate action without a warrant. We conclude that, even if the trial court erred in failing to suppress the results of the warrantless EMS blood draw, any such error was harmless beyond a reasonable doubt.

A compelled blood draw is a search of the person. *State v. Reynolds*, 504 S.W.3d 283, 304 (Tenn. 2016) (citing *Birchfield v. North Dakota*, 579 U.S. 438, 455 (2016)). A warrantless blood draw is therefore presumptively unreasonable unless the State establishes a recognized exception to the warrant requirement. *See State v. Richards*, 286 S.W.3d 873, 878 (Tenn. 2009); *State v. Williamson*, 368 S.W.3d 468, 474 (Tenn. 2012). The State relies on the exigent-circumstances exception, which applies when a warrantless search is supported by probable cause and circumstances showing a compelling need to act without time to obtain a warrant. *See Richards*, 286 S.W.3d at 878; *State v. Hutchison*, 482 S.W.3d 893, 916 (Tenn. 2016), *abrogated on other grounds by Smith v. Arizona*, 602 U.S. 779 (2024). When law enforcement conducts a warrantless search under this exception, the State bears the burden of proving that the exception applies. *See State v. Guy*, 679 S.W.3d 632, 670 (Tenn. Crim. App. 2023).

Even assuming that the trial court erred in failing to suppress evidence of the warrantless EMS blood draw—a conclusion on which we express no opinion—the error would be subject to harmless-error review as a non-structural constitutional error. *State v. Ingram*, 331 S.W.3d 746, 759 (Tenn. 2011); *see also Hutchison*, 482 S.W.3d at 921. Such an error is harmless when the State proves beyond a reasonable doubt that the erroneously admitted evidence did not contribute to the verdict. *Ingram*, 331 S.W.3d at 759; *see also Sanders*, 452 S.W.3d at 306; *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008).

In this case, the EMS blood-draw result was not the only blood-alcohol evidence before the jury. Two additional samples drawn at VUMC were obtained pursuant to the later warrant and were properly admitted at trial. Those samples, drawn at approximately 4:28 a.m. and 7:18 a.m. on August 7, 2021, returned blood-alcohol concentration results of 0.296 and 0.214, respectively. The EMS blood draw returned a result of 0.283. Thus, one of the properly admitted VUMC samples reflected a blood-alcohol concentration higher than the EMS result, and both properly admitted results were far above the legal limit of 0.08 percent.

The Defendant argues that the alleged error could not be harmless because the State used all three blood-test results in the closing argument to reinforce their scientific reliability. We respectfully disagree. The two properly admitted VUMC results independently established the Defendant's intoxication at levels more than twice the legal limit. The EMS result was consistent with those admissible results, but it did not materially add to the State's proof of intoxication. Rather, it was cumulative of properly admitted scientific evidence showing the same essential fact. *See McLawhorn*, 636 S.W.3d at 245-46.

The remaining evidence of intoxication further confirms that the EMS result did not contribute to the verdicts. The Defendant drove the wrong way on Highway 55 in the early morning hours and struck Ms. Bauer's vehicle head-on, causing her death. Emergency personnel who treated the Defendant at the scene detected an odor of alcohol. A search of the Defendant's vehicle revealed two broken liquor bottles, a broken wine bottle, and three empty beer cans. The Defendant also admitted in his investigative interview to consuming between twelve and sixteen beers on the day of the crash.

Considering the properly admitted VUMC blood-test results together with the other evidence of intoxication, we conclude beyond a reasonable doubt that any alleged error in admitting the EMS blood-draw result did not contribute to the verdicts. The Defendant is not entitled to relief on this ground.

## B.    TRIAL ISSUES

The Defendant raises six additional issues regarding his trial. He contends that the trial court erred by: (1) admitting a life-in-being photograph of Ms. Bauer; (2) finding that the VUMC specimen release form satisfied the business records exception to the rule against hearsay; (3) finding that chain of custody was established for the VUMC blood samples; (4) admitting the VUMC blood evidence in violation of the Confrontation Clause; and (5) instructing the jury on vehicular homicide per se in a manner that created an unconstitutional presumption of guilt. The Defendant also contends that (6) the cumulative effect of these trial errors deprived him of a fair trial.

We address each of these issues in turn.

### 1.    Admissibility of Ms. Bauer's Life-in-Being Photograph

The Defendant alleges the trial court erred in admitting Ms. Bauer's life-in-being photograph pursuant to Tennessee Code Annotated section 40-38-103(c).  He argues that the photograph was not relevant to any issue in dispute at trial and was offered only to garner sympathy and inflame the jury against him.  The State responds that Tennessee Code Annotated section 40-38-103(c) renders the photograph relevant when used to show the general appearance and condition of Ms. Bauer while alive.  We agree with the Defendant that the photograph should not have been admitted, but we conclude that any error was harmless.

A trial court considering the admission of a life-in-being photograph must conduct a two-step inquiry.  First, the court must determine whether the photograph is relevant by considering whether the purported use of the photograph corresponds to a genuinely disputed issue at trial.  *State v. Adams*, 405 S.W.3d 641, 658 (Tenn. 2013); *State v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at *19 (Tenn. Crim. App. Apr. 2, 2024), *perm. app. denied* (Tenn. July 18, 2024).  If the purpose for which the photograph is offered does not correspond to a disputed issue, the photograph is not relevant and must be excluded.  *Mosley*, 2024 WL 1406156, at *19; Tenn. R. Evid. 402.  Even if the photograph were relevant to a disputed issue, it must still survive the balancing test of Tennessee Rule of Evidence 403.  *Mosley*, 2024 WL 1406156, at *19; *State v. Donaldson*, No. E2019-00543-CCA-R3-CD, 2020 WL 2494478, at *10 (Tenn. Crim. App. May 14, 2020), *perm. app. denied* (Tenn. Sept. 16, 2020).  A desire merely to "personalize" the victim for the jury, standing alone, does not constitute a purpose cognizable under either *Adams* or the statute.  *Mosley*, 2024 WL 1406156, at *19.

Our prior cases illustrate the kind of case-specific relevance that satisfies the first step of the *Adams* inquiry.  In *State v. Reed*, for example, the State sought to admit a life-in-being photograph to show the defendant's intent and premeditation.  *See State v. Reed*, No. E2019-00771-CCA-R3-CD, 2020 WL 5588677 (Tenn. Crim. App. Sept. 18, 2020), *perm. app. denied* (Tenn. Feb. 5, 2021).  The photograph depicted the victim's facial profile before death, which the State used to show that an injury visible after death was inconsistent with her appearance in life, directly supporting its theory of how the killing occurred.  *Id.* at *25-26.  The photograph thus bore on a genuinely contested issue—the manner and force of the killing—in a concrete and identifiable way.

In this case, the Defendant objected to the admission of the life-in-being photograph at the outset of the trial in a jury-out hearing. Notwithstanding its acknowledgment of this court's opinion in *Mosley*, the trial court found that the legislature's enactment of Tennessee Code Annotated section 40-38-103(c) resolved the question of the photograph's relevance. The court deemed the photograph relevant on that basis and weighed its probative value against the danger of unfair prejudice. Comparing the photograph in this case to the one at issue in *Mosley*, the court found that the photograph here was not "overdone" in an attempt to play on the sympathies of the jurors. The court therefore concluded that the danger of unfair prejudice did not outweigh the probative value and ruled the photograph admissible. The Rule 403 finding is facially adequate as a procedural matter. The trial court's stated rationale, however, does not satisfy the first step of the *Adams* inquiry.

Unlike the life photograph in *Reed*, which bore on a specific, disputed question of intent and premeditation, the photograph here served no comparable case-specific purpose. By relying solely on Tennessee Code Annotated section 40-38-103(c) to resolve the relevance question, the trial court effectively admitted the photograph for the very purpose that *Mosley* identified as insufficient: personalizing the victim for the jury. Neither the court nor the State argued that the photograph corresponded to any genuinely disputed issue at trial. The statute neither mandates admission in all circumstances nor eliminates the trial court's gatekeeping obligation. *See Mosley*, 2024 WL 1406156, at \*19. Because the photograph was not offered for a purpose corresponding to any genuinely disputed issue, it was not relevant and should have been excluded. *See Adams*, 405 S.W.3d at 657-58; Tenn. R. Evid. 402.

Despite this error, we conclude that its admission was harmless. "Generally, photographs taken during the life of a victim are not so prejudicial as to warrant a new trial." *Adams*, 405 S.W.3d at 658. The question is whether the jury would have reached the same verdict absent the photograph. *See State v. Young*, 196 S.W.3d 85, 106-07 (Tenn. 2006). The inculpatory evidence in this case was significant. The Defendant drove the wrong way on a divided highway in the early morning hours. He struck Ms. Bauer head-on and killed her. A strong odor of alcohol emanated from his person. He admitted that he had consumed between twelve and sixteen beers throughout that day, and officers found two broken liquor bottles, a broken wine bottle, and three empty beer cans in his vehicle. His blood alcohol concentration was more than twice the legal limit. Although the life-in-being photograph may have been capable of arousing some sympathy from the jury, there is no reasonable basis on this record to conclude that its admission contributed to the verdict. We are satisfied that the jury would have reached the same conclusion had the photograph been excluded. The Defendant is not entitled to relief on this ground.

Consistent with the guidance offered in *Adams* and *Mosley*, we observe that this conclusion of harmlessness should not be taken as approval of the admission of similarly irrelevant life-in-being photographs in future cases. *See Adams*, 405 S.W.3d at 658; *Mosley*, 2024 WL 1406156, at *19.

### 2. Admission of the Specimen Release Form

The Defendant next challenges the trial court's decision to admit the VUMC specimen release form under Tennessee Rule of Evidence 803(6), the business records exception to the rule against hearsay. He argues that the State failed to establish two requirements for admission under Rule 902(11)(A) and (C), which Rule 803(6) incorporates: that the form was created at or near the time of the events it recorded and that it was created as part of a regular practice of a regularly conducted business activity. The State responds that the lab manager's testimony satisfied each element of Rule 803(6) and that the trial court properly admitted the form. We agree with the State.

As background for this issue, the State called Elisa Grady, VUMC's manager of specimen receiving, to authenticate the specimen release form at trial. Ms. Grady testified that VUMC's specimen receiving department is an ongoing institutional operation whose core functions include receiving, scanning, retrieving, and routing specimens on a continuing basis. She testified that she completes a release form upon every transfer of specimens to law enforcement personnel, and that she signed and dated the form at issue here on August 10, 2021, at 10:50 a.m., the moment she transferred the Defendant's specimens to law enforcement. The trial court found that "her entire job was to make sure that that was done correctly."

Tennessee Rule of Evidence 803(6) provides that records of regularly conducted activities are not excluded by the prohibition against hearsay evidence. As our supreme court has observed, "[t]he purpose of this hearsay exception is to permit the use of inherently trustworthy business records at trial by eliminating the expense and inconvenience that would result from requiring the testimony of everyone involved in the preparation and maintenance of such records." *Arias v. Duro Standard Prods. Co.*, 303 S.W.3d 256, 262 (Tenn. 2010). To qualify under this exception, the proponent must show, through the testimony of the custodian or other qualified witness, the following five criteria:

(1)     The document must be made at or near the time of the event recorded;

(2)     The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

(3)     The person providing the information in the document must be under a business duty to record or transmit the information;

(4)     The business involved must have a regular practice of making such documents; and

(5)     The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

*Arias*, 303 S.W.3d at 263.  The exception is unavailable if the source of information, the method, or the circumstances of preparation indicate a lack of trustworthiness.  Tenn. R. Evid. 803(6).  We review a trial court's decision to admit records under Tennessee Rule of Evidence 803(6) for an abuse of discretion.  *State v. Webb*, 130 S.W.3d 799, 830 (Tenn. Crim. App. 2003).

The Defendant does not dispute that Ms. Grady had firsthand knowledge of the transfer and a business duty to document it, or that the form's preparation indicates no lack of trustworthiness.  We accordingly limit our analysis to the two elements he contests: timing and regular practice.

### a.     Made At or Near the Time of the Event Recorded

The Defendant argues that the testimony at trial "did not show anything about the records being made at the time of the events discussed," because Ms. Grady offered no information about who collected the Defendant's blood, when, or under what circumstances.  His argument assumes that the release form documents the collection of his blood, and that the Rule 803(6) foundation must therefore account for who drew the blood and labeled the tubes.  That assumption is incorrect.  The release form records an independent, subsequent event: the transfer of specimens from the VUMC laboratory to law enforcement.  The foundational requirements for this form attach to that transfer, not to the earlier blood draw.  Evidence about the blood draw itself bears on the chain of custody, which we address in the following section.

From our review, the form was made at or near the time of the event it records. The dispositive question on this element is whether any interval between the event and its recording was long enough to undermine the form's accuracy. *See* Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.11[7] (7th ed. 2024). No such lengthy interval exists here. Ms. Grady, VUMC's manager of specimen receiving, signed and dated the form on August 10, 2021, at 10:50 a.m.—the moment she transferred the specimens to law enforcement. The Defendant points to the three days between the blood draw and the transfer, but, again, the blood draw is not the event the form records. We conclude that this element is satisfied.

### b.     Regular Practice of Making Such Documents

The Defendant also argues that the same testimony "did not show anything about the records being made . . . as regular practice," again pointing to the absence of testimony about who drew the Defendant's blood, when, or how. As before, his argument again addresses the wrong event. The regular-practice element asks whether *this form*—the record of the transfer—was created according to VUMC's ordinary procedures, not whether the antecedent blood draw was performed according to a regular practice.

The form was created as part of a regularly conducted business practice. Ms. Grady testified that VUMC's specimen receiving department is an ongoing institutional operation. Its core functions include receiving, scanning, retrieving, and routing specimens on a continuing basis. The trial court found that "her entire job was to make sure that that was done correctly." Ms. Grady also testified that she completes a release form upon every transfer of specimens to law enforcement personnel. Ms. Grady's testimony establishes that completing a release form upon every transfer to law enforcement is a regular practice of VUMC's specimen receiving operations. We conclude that this element is likewise satisfied.

As to the specific elements challenged by the Defendant, he has not shown that the trial court abused its discretion in admitting the specimen release form as a business record under Tennessee Rule of Evidence 803(6). Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

### 3.     Chain of Custody

The Defendant next argues that the trial court erred in admitting the VUMC blood samples and the TBI analysis of them. He asserts that the State failed to authenticate the

samples as his blood because it did not call the VUMC phlebotomist who drew them. The State responds that VUMC's patient-identification procedures and the TBI's receipt and testing records sufficiently established the samples' identity and integrity. We agree with the State.

### a.     Governing Law

Tennessee Rule of Evidence 901(a) provides that authentication is satisfied by "evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). As applied to tangible evidence, "a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (citation and internal quotation marks omitted). The purpose of this requirement is to ensure "that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *Id.* (citation and internal quotation marks omitted). We review a trial court's chain-of-custody determination for an abuse of discretion. *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008).

A party seeking to admit tangible evidence need not prove identity "beyond all possibility of doubt," nor must it "exclude every possibility of tampering." *Id.* at 296. Although "each link in the chain of custody should be sufficiently established," an item is not inadmissible simply because the State fails to call every person who handled it. *Id.* Instead, when "the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* Our supreme court has applied this standard to biological specimens, reaffirming that the surrounding circumstances need only provide "reasonable assurance" of a sample's identity. *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009).

Tennessee courts have recognized that the first link in the chain may look different when medical personnel collect a biological specimen for treatment purposes. *See State v. Braden*, 867 S.W.2d 750, 758-59 (Tenn. Crim. App. 1993); *Davis*, 278 S.W.3d at 267-68. In that setting, the State may establish the first link through the surrounding circumstances of collection rather than through the testimony of the person who drew the specimen. The absence of testimony from the person who collected the specimen affects the weight of the evidence, not its admissibility. *See Shell v. Law*, 935 S.W.2d 402, 409-10 (Tenn. Ct. App. 1996) (holding that the failure to call the phlebotomist did not render blood-test evidence

incompetent, because the circumstances of collection and testing affected weight, not admissibility).

Those surrounding circumstances must show that the specimen was taken from the defendant and identified as the defendant's at or near the time of collection. They may include patient identification procedures, medical record numbers, and labels on specimen containers. *See Braden*, 867 S.W.2d at 758-59 (holding that the chain of custody was sufficient despite the form's failure to identify the blood drawer, because hospital records uniquely identified the patient and the record showed no irregularity). Accompanying hospital forms, the timing and location of treatment, and the absence of any evidence of tampering or substitution may also support the first link. *See Davis*, 278 S.W.3d at 267-68 (holding that the absence of the collector's testimony was not fatal where surrounding documentation provided reasonable assurance of the sample's identity).

Among these circumstances, proof of an organization's routine practice may be especially important in establishing this first link. Tennessee Rule of Evidence 406(a) permits evidence of an organization's routine practice to prove conforming conduct on a particular occasion. Tenn. R. Evid. 406(a). This court has recognized that testimony about an institution's ordinary procedures may supply a satisfactory chain-of-custody link, particularly when routine identification and storage procedures were followed and the record shows no evidence of tampering, substitution, or irregularity. *State v. Daniels*, 656 S.W.3d 378, 390-91 (Tenn. Crim. App. 2022); *see also Kroese*, 2024 WL 2034366, at *18-19.

### b. Analysis

The trial court found that the State established a sufficient chain of custody for the VUMC blood samples. It found no showing of "irregularity, tampering, or degrading." When the Defendant renewed his objection at trial, the court further found that "[VUMC] drew the blood within its normal course of business," that VUMC added the Defendant's unique identifying information and date of birth to the tube, and that VUMC sent the tube "directly to the lab where it was stored and logged." The court concluded that "all the links have been established" and correctly recognized that the law does not require a "perfect" or "absolute 100%" chain. The record supports these findings.

VUMC drew the Defendant's blood during his medical treatment after the crash. Ms. Grady testified that VUMC assigns each patient a unique medical record number and

that number follows the patient and the patient's specimens throughout VUMC's system. She verified that the specimens released to law enforcement bore the Defendant's identifying information, including his unique medical record number, and she completed the specimen release form for those samples. These circumstances establish the first link: the specimens were collected from the Defendant during his medical treatment and identified as his through VUMC's standard patient-identification procedures. Ms. Grady also testified that VUMC stored the samples in a designated refrigerated area for law enforcement specimens after receiving the preservation request.

Investigator Kennedy received the specimens from Ms. Grady when he executed the search warrant at VUMC on August 10, 2021. He submitted the samples to the TBI that same day. The TBI's records documented the receipt and processing of the samples. Special Agent Klingaman, a forensic scientist with the TBI, testified that she personally received the samples and processed them. She further testified that the samples showed no signs of irregularity, tampering, or degradation upon receipt or during testing. The Defendant identifies no mismatch in the identifying information, no broken seal, no storage irregularity, and no evidence of tampering or substitution. We conclude that the State offered a sufficient chain of custody for the VUMC blood draw samples.

Pushing against this conclusion, the Defendant offers two arguments. First, he asserts that the State could not authenticate the samples without testimony from the VUMC phlebotomist who drew the blood. We respectfully disagree. The supreme court has made clear that the State need not call every person who handled an item of evidence. *Cannon*, 254 S.W.3d at 296. In addition, courts applying this principle to biological specimens have each confirmed that the failure to call the sample's collector is not dispositive when other evidence supplies reasonable assurance of identity. *Davis*, 278 S.W.3d at 267-68; *Shell*, 935 S.W.2d at 409-10; *Braden*, 867 S.W.2d at 758-59.

Indeed, our decision in *Kroese* is directly on point. There, the defendant's blood was also drawn at VUMC in the course of medical treatment. No officer witnessed the draw, and the State did not present testimony from the person who drew the blood. *Kroese*, 2024 WL 2034366, at *18. This court held that the State established an adequate chain of custody. The proof included testimony about VUMC's routine patient-identification procedures, such as its use of a unique medical record number, and proof that the officer retrieved the samples under a warrant and delivered them to the TBI. *Id.* at *18-19.

The facts here are materially identical. VUMC's patient-identification system, the specimen labels, the release form, and the trial court's express findings reasonably connect

the specimens to the Defendant. The record shows no irregularity suggesting tampering, loss, substitution, or mistake. The phlebotomist's absence therefore affects the weight of the evidence, not its admissibility. *Daniels*, 656 S.W.3d at 390-91; Tenn. R. Evid. 406(a).

Second, the Defendant argues in his reply brief that the State showed neither "the beginning" nor "the end" of the chain. The record refutes that characterization on both points. The beginning is established by VUMC's medical-treatment draw, its routine patient-identification and labeling procedures, and the trial court's express finding. The end is established by Investigator Kennedy's receipt of the specimens, his submission to the TBI, the TBI's processing records, and Special Agent Klingaman's testimony. At most, the Defendant identifies a potential weakness in the State's proof that he was free to explore before the jury.

The trial court applied the correct legal standard and reached a decision within the range of reasonable outcomes. It acted within its discretion to admit the VUMC blood samples and the resulting TBI analysis. The Defendant is not entitled to relief on this issue.

### 4. Confrontation Clause Challenge

The Defendant next argues that the admission of evidence derived from the VUMC blood samples violated his constitutional right to confront the witnesses against him. He asserts that the State was required to call the VUMC nurse or medical professional who drew his blood before the State could establish that the samples belonged to him. The State responds that the challenged medical records and specimen-identification information were nontestimonial and therefore were not subject to exclusion under the Confrontation Clause. We agree with the State.

### a. Governing Law

The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *see State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014). Article I, section 9 of the Tennessee Constitution provides a similar right, and Tennessee courts apply the same analysis under both provisions. *Dotson*, 450 S.W.3d at 62. Whether the admission of hearsay statements violated a defendant's rights under the Confrontation Clause is a

question of law, which we review de novo.  *State v. Lewis*, 235 S.W.3d 136, 142 (Tenn. 2007).

The Confrontation Clause does not require the State to call every person who drew, handled, or helped identify physical evidence.  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009).  As a general matter, the absence of the person who drew a defendant's blood does not itself establish a confrontation violation when that person did not analyze the blood or prepare a testimonial forensic report.  *See State v. Fleming*, No. E2016-01746-CCA-R3-CD, 2018 WL 1433503, at *16 (Tenn. Crim. App. Mar. 22, 2018) (citing *Milligan v. State*, 116 A.3d 1232, 1240 (Del. 2015)), *perm. app. denied* (Tenn. July 18, 2018).  Chain-of-custody challenges based on the absence of such testimony generally go to the weight of the evidence, not to its constitutional admissibility.  *See Milligan*, 116 A.3d at 1240-41.

The Confrontation Clause also does not bar the admission of hospital records and specimen-identification information created for purposes of medical diagnosis and treatment rather than for use at trial.  *See Cannon*, 254 S.W.3d at 301, 303.  Ordinary medical records generally do not implicate the Confrontation Clause because they are created for the administration of a patient's medical care, not for the purpose of proving facts at trial.  *See Melendez-Diaz*, 557 U.S. at 324.  The United States Supreme Court has specifically recognized that medical reports created for treatment purposes "would not be testimonial" under the *Crawford* framework.  *Id.* at 312 n.2.  Consistent with that principle, this court has held that blood-work results contained in hospital records are not subject to Confrontation Clause scrutiny when the records were compiled and the blood work was conducted primarily for purposes of medical treatment rather than law enforcement.  *Asbury*, 2010 WL 1741365, at *7-8.  A statement must still satisfy the ordinary rules governing hearsay even if the Confrontation Clause does not bar its admission.  *Cannon*, 254 S.W.3d at 301.

### b.      Application

The Defendant does not identify a statement made by the absent VUMC nurse or medical professional that the State introduced against him.  Instead, he argues that the State could not establish that the VUMC samples were taken from him without calling the person who drew the blood as a witness.  Properly understood, this argument principally challenges the foundation for the admission of the samples and the weight of the State's chain-of-custody proof, not the Defendant's right to confront witnesses against him.  As discussed in the preceding section, the absence of testimony from the person who drew the

Defendant's blood is resolved as a matter of chain of custody and authentication; it does not independently establish a constitutional violation.

The Confrontation Clause did not require the State to call the nurse who drew the Defendant's blood. The nurse drew the blood; she did not analyze it or prepare a forensic report. The TBI analyst who performed the forensic blood-alcohol testing testified at trial, and the Defendant had the full opportunity to cross-examine her. The absence of the VUMC nurse's testimony does not itself implicate the Confrontation Clause. *See Fleming*, 2018 WL 1433503, at *16; *Milligan*, 116 A.3d at 1240.

The Defendant's Reply Brief advances a narrower argument: that these particular specimens, organized and released pursuant to a search warrant, were created for a prosecutorial purpose because the "primary purpose was to give certain tubes to the police—in order to prosecute [the Defendant]." This argument conflates the act of releasing pre-existing evidence with the creation of evidence for prosecutorial use. The relevant inquiry focuses on the purpose for which the challenged statement or record was created, not the purpose for which it was later produced to law enforcement. *See Melendez-Diaz*, 557 U.S. at 324.

The blood samples and patient-identification information were created on August 7, 2021, when the Defendant arrived at VUMC and hospital personnel assigned him a medical record number and drew his blood as part of his emergency medical treatment. Law enforcement did not execute a search warrant until August 10, 2021—three days after the blood draw. This case is therefore unlike *Melendez-Diaz*, where the certificates at issue were created by forensic analysts for the purpose of establishing a fact against the defendant. *See* 557 U.S. at 311. The execution of the warrant here authorized law enforcement to obtain evidence that already existed; it did not direct VUMC to create a statement or record for prosecutorial use, as occurred in *Melendez-Diaz*. No VUMC employee created a comparable testimonial certificate or forensic report here.

The State also called Ms. Grady, the VUMC manager who released the specimens to law enforcement. Ms. Grady testified about VUMC's use of unique medical record numbers, identified the specimen release form, and explained that the samples released to law enforcement were associated with the Defendant's medical record number. The Defendant had the full opportunity to cross-examine her about the release process, the form she signed, VUMC's procedures, and the limits of her personal knowledge. The specimen release form documented the transfer of hospital-held specimens to law enforcement and linked those specimens to VUMC's preexisting patient-identification system; it did not

certify a forensic result or itself purport to establish the Defendant's blood-alcohol concentration. *See Milligan*, 116 A.3d at 1240-41.

The absence of testimony from the VUMC nurse who drew the blood may bear on issues of authentication or the weight of the resulting forensic analysis. It does not establish a violation of the Defendant's right to confront the witnesses against him. The Defendant is not entitled to relief on this issue.

### 5. Jury Instruction on Vehicular Homicide

The Defendant challenges the trial court's jury instruction on vehicular homicide per se in Count 2 as creating an unconstitutional presumption of guilt. Specifically, he argues that defining intoxication as having .08 percent or more alcohol concentration in the blood or breath eliminates the jury's function in determining whether he was actually intoxicated. He further asserts that this instruction improperly influenced the jury's deliberations on Count 1.

The State responds that the instruction accurately reflects the statutory definition of intoxication as incorporated into the vehicular homicide statute, that no presumption was created, and that the jury retained its fact-finding function. We agree with the State.

### a. Standard of Appellate Review

"Questions involving the propriety of jury instructions are mixed questions of law and fact," which this court reviews de novo with no presumption of correctness. *State v. Benson*, 600 S.W.3d 896, 902 (Tenn. 2020); *State v. Hollon*, 671 S.W.3d 561, 564 (Tenn. Crim. App. 2023).

A defendant is entitled "to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017) (citation and internal quotation marks omitted). Trial courts must, without request, give proper jury instructions on the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial. *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citation omitted).

To determine whether to reverse a conviction based on an erroneous jury instruction, this court "must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (citation and internal quotation marks omitted). A jury charge "is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (citation and internal quotation marks omitted).

### b.     Vehicular Homicide Instructions

The trial court referred to the pattern jury instruction when charging the jury on Count 2. The instruction provided:

> Any person who commits the offense of vehicular homicide is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: (1) that the defendant killed the alleged victim by the operation of a motor vehicle, and (2) that the defendant acted recklessly, and (3) that the killing was the proximate result of the driver's intoxication. For purposes of your consideration in Count 2 only, intoxication is defined as having an alcohol concentration in the blood or breath of eight-hundredths of one percent, .08, or more.

*See also* Tennessee Pattern Instruction – Criminal § 7.08(c).

The Defendant raises three objections. He first argues that the instruction's definition of intoxication is inconsistent with the vehicular homicide statute, which he reads as requiring proof of actual impairment. He further maintains that the definition creates an unconstitutional mandatory presumption of guilt in violation of the Due Process Clause. Finally, he asserts that even if the instruction were limited to Count 2, it improperly affected the jury's deliberations on Count 1. We respectfully disagree.

The Defendant's statutory argument turns on the relationship among three provisions. Section 39-13-213(a)(2) defines vehicular homicide by intoxication as the reckless killing of another as the proximate result of "[t]he driver's intoxication, *as set forth in* § 55-10-401." (emphasis added). It further provides that "intoxication" for purposes of that section "includes alcohol intoxication *as defined by* § 55-10-411(a)." Tenn. Code Ann. § 39-13-213(a)(2) (emphasis added).

Section 55-10-401—the DUI statute—establishes two theories of liability: driving while under the influence of an intoxicant that impairs the ability to safely operate a motor vehicle, *id.* § 55-10-401(1), and driving with a blood or breath alcohol concentration of .08 percent or more, *id.* § 55-10-401(2). Because the vehicular homicide statute incorporates the intoxication theories set forth in section 55-10-401, both theories are available to prove the intoxication element of vehicular homicide. *See State v. Faulk*, 718 S.W.3d 521, 553 (Tenn. Crim. App. 2025) (quoting both subsections of section 55-10-401 together when describing the intoxication element of vehicular homicide); *Oaks*, 2019 WL 560271, at *14 (same).

The Defendant argues that the vehicular homicide statute's cross-reference to section 55-10-411(a) limits the State to proving intoxication through a permissive inference of impairment. We respectfully disagree. Section 55-10-411(a) provides that proof of a blood alcohol concentration of .08 percent or more permits the jury to infer that the defendant was impaired for the purposes of section 55-10-401(1). In other words, that statute supplies one way for the State to prove actual impairment.

But section 55-10-401 contains a separate theory of DUI. Under section 55-10-401(2), the State may prove DUI by showing that the defendant drove with a blood alcohol concentration of .08 percent or more, regardless of whether it separately proved actual impairment. Nothing in section 55-10-411(a) eliminates or narrows that per se theory. The Defendant's reading would treat the cross-reference to the impairment subsection as an unstated limitation on the separate per se subsection. We decline to read that limitation into the statute. Accordingly, we conclude the trial court correctly instructed the jury.

The Defendant's constitutional argument fares no better. A jury instruction violates the Due Process Clause if it relieves the State of its burden to prove every element of the offense beyond a reasonable doubt. *See, e.g.*, *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *State v. Sensing*, 843 S.W.2d 412, 417 (Tenn. 1992). The threshold question is whether the instruction creates a mandatory presumption or merely a permissive inference. *Francis*, 471 U.S. at 314. The analysis requires examining whether a reasonable juror could have read the challenged language as mandating a finding on an element of the offense, considering both the specific words and the charge as a whole. *Id.* at 315.

The Count 2 instruction satisfies this standard because it did not create a presumption of any kind—mandatory or permissive. It supplied a statutory definition. The instruction told the jury what the word "intoxication" means for purposes of Count 2; it did not tell the jury to presume intoxication upon proof of any other fact. The State was still

required to prove beyond a reasonable doubt that the Defendant had a qualifying BAC, and the jury remained free to reject that proof. Confirming this conclusion, the trial court's charge instructed the jury that the State bore the burden of proving every element beyond a reasonable doubt, that the jury was the exclusive judge of the facts, and that the jury could, but need not, draw an inference from the blood alcohol evidence. Reading the Count 2 instruction against that backdrop, no reasonable juror could have understood it as removing the State's burden to prove the BAC element.

The Defendant relies on *State v. Robinson*, 29 S.W.3d 476 (Tenn. 2000), to argue that a BAC-based instruction must be framed only as a permissive inference, not as a presumption or definition of intoxication. He also argues that any instruction treating a qualifying BAC result as conclusive proof of intoxication violates his right to a fair trial. We agree with the general principles the Defendant draws from *Robinson*, but we conclude that neither applies to the Count 2 instruction.

*Robinson* addressed a DUI instruction that used the statutory term "presumption." The court directed that such language be replaced with permissive inference language. It upheld the instruction before it, finding no constitutional violation. *Robinson*, 29 S.W.3d at 481-82. The court's concern was with the word "presumption" and the risk that a jury would treat an evidentiary inference as mandatory.

That concern does not apply here because the Count 2 instruction created no inference at all—mandatory or permissive. It stated what the legislature has defined intoxication to mean for purposes of the per se vehicular homicide offense. The State was still required to prove that the Defendant had a qualifying BAC, and the jury remained free to reject that proof. A statutory definition of an element is not a presumption, and *Robinson* does not hold otherwise.[2] The same analysis disposes of the Defendant's related challenge to Special Agent Klingaman's trial testimony. That testimony reflected the same statutory definition embodied in the Count 2 instruction.

Finally, the Defendant contends that even if the Count 2 instruction were proper in isolation, it improperly affected the jury's deliberations on Count 1. This argument is without merit. The instruction expressly limited the per se BAC definition to Count 2. On

---

[2] Although Special Agent Klingaman did not limit her statement to Count 2, the trial court had already given an express instruction limiting the per se BAC definition to Count 2 only. Jurors are presumed to follow the instructions they receive. *See Francis*, 471 U.S. at 324 n.9. Her testimony did not override that instruction, and the Defendant has identified no evidence that the jury disregarded it.

Count 1, the jury received a separate permissive-inference instruction advising it that a finding of .08 percent BAC permitted—but did not require—an inference of intoxication. The jury system rests on the premise that jurors follow the instructions given to them. *Francis*, 471 U.S. at 324 n.9. The Defendant has offered no evidence to rebut that premise here. The limiting language was unambiguous, the two counts were governed by distinct instructions, and those instructions were internally consistent in directing the jury to evaluate each count separately. The Defendant is not entitled to relief on this issue.

### 6. Cumulative Error

The Defendant finally argues that the cumulative effect of the errors in this case deprived him of a fair trial. The State responds that the doctrine is inapplicable because the Defendant has not established sufficient trial errors to support aggregation. We agree with the State that the Defendant is not entitled to relief.

The cumulative error doctrine applies when "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). The doctrine requires the existence of more than one actual error before it may be applied. *Id.* at 77. Because a defendant is not guaranteed a perfect trial, "the circumstances warranting the reversal of a conviction under the cumulative error doctrine are rare." *State v. Reynolds*, 635 S.W.3d 893, 933 (Tenn. 2021).

Upon our review of the issues presented, we have identified a single error—the admission of Ms. Bauer's life-in-being photograph—which we have determined to be harmless. Because the Defendant has not established the existence of more than one error in the trial proceedings, there are no errors to aggregate, and the predicate for applying the cumulative error doctrine is not satisfied. *See State v. Allman*, 712 S.W.3d 467, 560 (Tenn. Crim. App. 2024) ("Because we have only found one error in this case, the cumulative error doctrine is inapplicable."). The Defendant is not entitled to relief on this ground.

### C. CONSECUTIVE SENTENCES

As his final issue, the Defendant challenges the trial court's determination that his sentence must be served consecutively to a sentence he had pending in Davidson County at the time of these offenses. Specifically, he contends that he was not "released on bail"

within the meaning of Tennessee Code Annotated section 40-20-111(b) and Tennessee Rule of Criminal Procedure 32(c)(3)(C) because he was released through a Davidson County pretrial release program on his own recognizance rather than on a traditional bail bond.

The State responds that the distinction the Defendant draws between bail and pretrial release is an immaterial distinction under applicable law. We agree with the State.

### 1. Background

At the sentencing hearing, it was undisputed that the Defendant had a pending DUI charge in Davidson County General Sessions Court at the time he committed the offense in this case. The sessions court entered a Conditions of Release Order, giving the Defendant two options for release from custody: he could post a $1,000 secured bond or seek acceptance into the Pretrial Services Department's supervision program. The Defendant entered the program. He then signed a Criminal Appearance Recognizance, under which he was released from custody on the conditions that he appear in court as required and comply with the terms of his supervised release. The recognizance expressly warned that failure to appear would result in re-arrest, more stringent release conditions, and possible criminal prosecution.

The trial court found that section 40-20-111(b) and Rule 32(c)(3)(C) mandated consecutive sentences. The trial court acknowledged the Defendant's textual argument concerning Rule 32(c)(3)(C) but rested its ruling primarily on the statute. Specifically, the court reasoned that section 40-20-111(b)'s cross-reference to "chapter 11, part 1 of this title" encompasses every form of pretrial release in Tennessee, including release on recognizance.

### 2. Standard of Appellate Review

The Defendant's principal sentencing issues involve the interpretation of a statute and a rule of criminal procedure. Both present questions of law that we review de novo with no presumption of correctness. *See, e.g.*, *Richards v. Vanderbilt Univ. Med. Ctr.*, 706 S.W.3d 319, 323 (Tenn. 2025); *State v. Lowe-Kelley*, 380 S.W.3d 30, 33 (Tenn. 2012).

### 3. Consecutive Sentences

With this standard guiding our review, we consider whether the trial court correctly concluded that section 40-20-111(b) and Rule 32(c)(3)(C) required consecutive sentencing. Because the Defendant does not dispute the existence of the Davidson County charge, his release pending disposition of that charge, or his convictions for both offenses, the issue is one of legal characterization: whether his release on recognizance under pretrial supervision was release "on bail" for purposes of the mandatory consecutive sentencing provisions.

Tennessee Code Annotated section 40-20-111(b) states in relevant part:

> In any case in which a defendant commits a felony while the defendant was released on bail in accordance with chapter 11, part 1 of this title, and the defendant is convicted of both offenses, the trial judge shall not have discretion as to whether the sentences shall run concurrently or cumulatively, but shall order that the sentences be served cumulatively.

Tenn. Code Ann. § 40-20-111(b) (2019). Rule 32(c)(3)(C) is a restatement of section 40-20-111(b). *See State v. Brown*, No. E2019-02222-CCA-R3-CD, 2021 WL 1625414, at *15 (Tenn. Crim. App. Apr. 27, 2021), *no perm. app. filed*. It provides that mandatory consecutive sentencing applies "to a sentence for a felony committed while the defendant was released on bail and the defendant is convicted of both offenses[.]" Tenn. R. Crim. P. 32(c)(3)(C). These provisions apply regardless of whether the prior offense for which the defendant was on pretrial release was a felony or a misdemeanor. *See State v. Vaughan*, No. M2014-02530-CCA-R3-CD, 2015 WL 8974913, at *3 (Tenn. Crim. App. Dec. 15, 2015), *perm. app. denied* (Tenn. Apr. 7, 2016).

The Defendant does not dispute that he had a pending charge in Davidson County at the time of this offense, or that he was convicted of both offenses. He argues instead that his court-supervised pretrial release did not constitute release "on bail" under section 40-20-111(b) and Rule 32(c)(3)(C).

The Defendant first asserts that the text of Rule 32 itself forecloses the broader reading of "bail." He observes that Rule 32(c)(3)(C) uses the word "bail" alone, while Rule 32(d)—which governs release after conviction pending further proceedings—uses the

broader phrase "bail or recognizance." From this difference, he contends that the term "bail" in subsection (c)(3)(C) excludes recognizance releases.

This court considered and rejected precisely this argument in *Goods v. Parker*, No. W2006-00849-CCA-R3-CO, 2007 WL 2120178 (Tenn. Crim. App. July 24, 2007), *no perm. app. filed*. The *Goods* court acknowledged the textual difference between Rule 32(c)(3) and Rule 32(d) and analyzed it directly. *Id.* at *5-6. Although the pretrial release statutes use separate terms for different release mechanisms, this court concluded in *Goods* that recognizance and pretrial supervision fall within the broader bail framework for purposes of section 40-20-111(b) and Rule 32(c)(3)(C). *Id.* at *6. The court reasoned that "bail" is defined in part as "[a] security such as a . . . bond," and that a recognizance is itself a form of bond—placing it within that definition rather than outside it. *Id.* (quoting *Black's Law Dictionary* 150 (8th ed. 2004)).

The court further reasoned that the requirement to impose consecutive sentences "should not hinge on a trial court's initial impression of whether a defendant will likely return to court to face charges." *Goods*, 2007 WL 2120178, at *6. The Defendant notes that the defendant in *Goods* was the party advocating for this reading because it served his interest in habeas relief, but that circumstance does not diminish the court's legal analysis. We conclude that *Goods*' reasoning is persuasive and adopt it here.

The Defendant's second argument is that section 40-20-111(b)'s cross-reference to "chapter 11, part 1 of this title" reincorporates the distinction between bail and recognizance because Chapter 11 itself treats recognizance and bail as alternative conditions of release. He reads the cross-reference as limiting the statute to defendants released on secured bonds and excluding those released on recognizance or pretrial supervision. We respectfully disagree.

Section 40-20-111(b) mandates consecutive sentences when a defendant commits a felony while "released on bail in accordance with chapter 11, part 1." The cross-reference to Chapter 11 identifies the pretrial release framework governing the initial release—it does not restrict the statute's reach to only those defendants who posted secured bonds under that framework. Chapter 11, Part 1 encompasses the full range of pretrial release conditions available under Tennessee law, from secured bonds to release on recognizance to supervised pretrial programs. *See* Tenn. Code Ann. §§ 40-11-115, -116, -117 (2019). The trial court correctly read the cross-reference as incorporating that entire framework rather than limiting the statute to a single form of release within it. That reading is consistent

with *Goods*, which examined the same statutory structure and reached the same conclusion. *See Goods*, 2007 WL 2120178, at *6.

The circumstances of the Defendant's actual release confirm this reading. The Davidson County court entered a formal release order, assigned a Pretrial Services agent to supervise the Defendant, and imposed conditions under which failure to appear would result in re-arrest. The Defendant's release was not informal or extrajudicial. It was a structured, court-supervised arrangement within Tennessee's pretrial release framework, under which the Defendant undertook a court-recognized obligation to appear in court and to comply with his release conditions. That obligation is precisely the kind of court-supervised pretrial release that section 40-20-111(b) addresses. *See Goods*, 2007 WL 2120178, at *6*; see also Brown*, 2021 WL 1625414, at *15 (concluding, for purposes of section 40-20-111(b), that "a defendant who commits a felony while on pretrial supervision for another crime, and is convicted of both crimes, is required to be sentenced to consecutive sentences").

Finally, the Defendant argues that any ambiguity in the word "bail" requires this court to adopt the narrower reading in his favor under the rule of lenity. Even assuming the rule of lenity applies to a mandatory consecutive sentencing statute, it does not assist the Defendant here. The rule of lenity operates as a "tie-breaker" only "when a penal statute remains grievously ambiguous or uncertain." *State v. Ruiz*, 716 S.W.3d 439, 451 (Tenn. Crim. App. 2024) (quoting *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022)). Where no grievous ambiguity or uncertainty exists, the rule of lenity has no application. *Id.* at 451-52. Moreover, "[a] party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute." *Id.* at 452 (quoting *Powers v. State*, 343 S.W.3d 36, 50 n.20 (Tenn. 2011)).

Applying ordinary legal definitions of "bail," reading section 40-20-111(b) together with the full scope of Chapter 11, Part 1, and considering this court's interpretation of those provisions in *Goods*, we conclude that the statute is not grievously ambiguous. The term "bail" fairly encompasses court-supervised pretrial release, including release on recognizance and pretrial supervision. Moreover, this court's interpretation of section 40-20-111(b) in *Goods*—decided more than a decade before this offense—placed defendants on notice that committing a crime while on any form of court-supervised pretrial release triggered the mandatory consecutive sentencing requirement. The rule of lenity does not apply.

In summary, we hold that the Defendant's Davidson County recognizance and pretrial-supervision release constituted release on bail within the meaning of Tennessee Code Annotated section 40-20-111(b) and Tennessee Rule of Criminal Procedure 32(c)(3)(C). Because the Defendant committed a felony while released pending disposition of the Davidson County DUI charge and was later convicted of both offenses, the trial court was required to order the sentence in this case to be served consecutively to the Davidson County sentence. The Defendant is not entitled to relief on this ground.

## CONCLUSION

In summary, we hold that the Defendant is not entitled to relief in any of the three broad categories of issues he raises. Regarding the six issues he raised relating to his motion to suppress, we hold that (1) the affidavit supporting the VUMC search warrant contained no false or reckless statements; (2) probable cause supported both the search warrant and judicial subpoena executed at VUMC; (3) the search warrant was not overbroad; (4) the search warrant and the judicial subpoena established a sufficient nexus between VUMC and the evidence sought; (5) the VUMC blood draws were not the result of state action; and (6) any alleged error in admitting evidence of the warrantless EMS blood draw was harmless beyond a reasonable doubt.

Regarding the six additional issues he raised related to his trial, we hold that (7) the error in admitting the life-in-being photograph was harmless in light of the other evidence of guilt; (8) the specimen release form was properly admitted under the business records exception to the rule against hearsay; (9) admission of the VUMC blood draw evidence was supported by a sufficient chain of custody; (10) the Confrontation Clause did not bar admission of the VUMC blood draw evidence; (11) the jury instruction on vehicular homicide per se did not create an unconstitutional presumption of guilt; and (12) the Defendant is not entitled to relief under the cumulative error doctrine.

Finally, we hold that (13) the trial court properly ordered the Defendant's sentence to run consecutively to a sentence he had pending in Davidson County at the time of these offenses. Accordingly, we respectfully affirm the judgments of the trial court.

s/ **Tom Greenholtz**

TOM GREENHOLTZ, JUDGE